**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | **CHAPTER 7** |
| **LAMBERT OIL COMPANY,** | ) | |
| **INC.** | ) | |
| | ) | **CASE NO.  03-01183-WSA** |

_____

| | | |
|---|---|---|
| **WILLIAM E. CALLAHAN, JR.,** | ) | |
| **TRUSTEE** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Adversary Proceeding No. 04-07135** |
| | ) | |
| **MOUNTAIN EMPIRE OIL COMPANY,** | ) | |
| **INC., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

## MEMORANDUM DECISION

This adversary proceeding is concerned with the attempt of William E. Callahan,

Jr., Trustee in bankruptcy (the Trustee) for Lambert Oil Company, Inc. (Lambert Oil), to recover

from Mountain Empire Oil Company, Inc. (MEO), Quality Properties, L.P. (Quality), and/or S &

T Investment Company, LLC (S&T) a sum of money representing the fair rental value of their

alleged occupancy and use of two convenience store properties located in Bristol, Virginia and

Jonesborough, Tennessee which he sold during the administration of Lambert Oil's bankruptcy

estate.  Such period of occupancy and use is alleged to have begun prior to the bankruptcy filing

and continued until the date the Trustee conveyed such properties, the Bristol store to Quality

and the Jonesborough store to S&T at Quality's request, on or about June 29, 2004.  MEO,

Quality and S&T are all owned and controlled by members of the Warren K. Broyles family with

1

MEO being the operating company and Quality and S&T being the title owning entities.  These entities are commonly represented in this proceeding and have admitted that MEO occupied and conducted business at these two locations during the time period in question but have denied any liability to compensate Lambert Oil's bankruptcy estate for the use and enjoyment of such premises, taking the position that any unliquidated and unresolved claims for the pre-sale use and enjoyment of the premises were not reserved by the Trustee in the deeds he prepared and tendered to the purchasers and therefore passed to the new owners as incidents of the ownership of the subject real estate.  These contentions have been previously raised in the course of this adversary proceeding both in their responsive pleadings to the Trustee's Amended Complaint and also by means of a Motion for Summary Judgment, which this Court has previously denied in its Memorandum Decision dated May 8, 2006.  After a trial held on October 18 and 19, 2006, the parties have filed post-trial memoranda and the issues are now ready for decision.  For the reasons stated below, the Court will enter a judgment in favor of the Trustee against MEO in the amount of $551,993.55 and will sustain the Motions to Dismiss filed by Quality and S&T.

FINDINGS OF FACT

Lambert Oil, the Debtor, filed a Chapter 11 petition in this Court on March 24, 2003.  It operated as a debtor-in-possession until the case was converted to one under Chapter 7 on September 16, 2003.  After this conversion William E. Callahan, Jr. was appointed as Lambert Oil's trustee in bankruptcy.

In the schedules filed in this case the Debtor indicated ownership of three separate

2

properties, consisting of the Bristol and Jonesborough convenience stores and an office/ warehouse facility located in Abingdon, Virginia.  In addition to these properties which the Debtor owned, it also held leases from various owners for five other convenience stores located in several Virginia locations.  In addition to the properties themselves, the Debtor also listed in Schedule B claims for unpaid rent against Mountain Empire Oil for these two stores, $31,499.13 for the Bristol store and $64,430.10 for the Jonesborough store.  In Schedule G, which requires a listing of all executory contracts and unexpired leases, Lambert Oil listed various leases for certain of its properties and equipment but made no reference to any contracts or leases for the two stores in question here.

A contractual relationship was established between Lambert Oil and Quality with respect to these two stores in dispute in April of 2002 by means of an undated "Contract of Purchase and Sale"[1] prepared by Quality and MEO's counsel, Mr. Harry Curtis Williams.  This contract was signed on behalf of Lambert Oil on April 8, 2002 by its president, Mr. Nick Lambert, and on behalf of Quality on the following date by its general partner, Mr. Warren K. Broyles.  Although the contract states that MEO is also a party, in fact MEO did not execute the contract and the Court has not observed any obligations purportedly imposed upon such company by its provisions.  MEO did furnish, however, the $5,000 deposit called for in the contract.  MEO also entered into a Management Contract[2] dated April 15, 2002 with Lambert Oil, discussed below, dealing with the actual operation of the convenience store business conducted at the Jonesborough, Tennessee location. According to the deposition testimony of

---

[1] Plaintiff's Exhibit no. 9.

[2] Plaintiff's Exhibit no. 10.

3

Mr. Warren Broyles, introduced in evidence as Plaintiff's Exhibit no. 17, he is both the

managing general partner of Quality and the president of MEO.

While the Contract of Purchase and Sale is nearly sixteen pages in length, its

provisions may be briefly summarized.  Lambert agreed to sell and Quality agreed to purchase

the Bristol and Jonesborough stores based on "an assumed purchase price of $1,900,000."[3]  The

exact purchase price, however, was to be the sum of the following:  $5,000 deposit; $195,000,

less certain credits, to be paid at closing; and Quality's assumption of the unpaid balances of (i)

two  loans[4], both dated March 3, 1999 made by Franchise Mortgage Acceptance Corporation

(FMAC) encumbering the titles to such properties, and (ii) an equipment lease with Lynray

Financial Corporation for car wash equipment located at the Jonesborough location.  Closing

was to occur within ninety days of Lambert Oil's execution of the Contract.  The Contract

further provided that Quality would "take over operation" of the two stores on April 16

(Jonesborough) and 23 (Bristol), 2002, respectively, and would pay Lambert Oil "daily rent"

equal to 1/365th of the mortgage and equipment lease payments pending closing.  Such

payments were to be credited back dollar-for-dollar against the $195,000 amount otherwise due

at closing.  Pending closing Lambert Oil was obliged to keep making the mortgage and

equipment lease payments so that such obligations would be current on the closing date.  If it

failed to do so, Quality was authorized to deduct any amounts necessary to bring these

---

[3] Paragraph 36 of Contract.

[4] The respective Loan and Security Agreement for each of these two loans can be found
at Plaintiff's Exhibits nos. 12 and 13.  The loan upon the Bristol store was in the original amount
of $615,000 and the loan upon the Jonesborough store was in the original amount of $1,260,000.
The loan notes, deeds of trust and car wash lease agreement were not introduced into evidence.

4

obligations current at closing from the $195,000 cash balance of the purchase price due at

closing.  Because all of these payments were to be credited back against the $195,000 balance

due at closing, Lambert Oil would benefit from an early closing while Quality would benefit

from a delayed closing as the amount due in cash at closing was reduced not just by the principal

portions of the mortgage and equipment lease payments, but also by their interest components.

Such an arrangement seems almost created to invite dispute and resulting delay in the conclusion

of the contracted sales.  Whether for that reason or others is not revealed by the evidence before

the Court, but no closing occurred within ninety days of April 8, 2002 or at any time thereafter

prior to the Trustee's sale of such properties to Quality and S&T pursuant to a new contract on

June 29, 2004.  Plaintiff's Exhibit no. 14 is a handwritten schedule of payments made pursuant to

these arrangements to Lambert Oil between May 13, 2002 and October 1, 2002, as follows:

Payments to Lambert

| Date | 120 | 124 Store | Car Wash | Total |
|------|-----|-----------|----------|-------|
| Apr  5-13-02 | 1,680.00 | 6,443.10 | 2,839.45 | 10,962.55 |
| May   6-7-02 | 6,510.00 | 13,315.74 | 2,839.45 | 22,665.19 |
| Jun   7-9-02 | 6,299.83 | 12,886.02 | 2,839.45 | 22,025.30 |
| Jul    8-1-02 | 6,510.00 | 13,315.74 | 2,839.45 | 22,665.19 |
| Aug   9-4-02 | 6,510.00 | 13,315.74 | 2,839.45 | 22,665.19 |
| Sep  10-1-02 | 6,299.83 | 12,886.02 | 2,839.45 | 22,025.30 |
| TOTALS | 33,809.66 | 72,162.36 | 17,036.70 | 123,008.72 |

Although such exhibit fails to designate the source of such payments, in response to an inquiry

from the Court to the Trustee during his testimony at trial, he stated that MEO made them and

such statement has not been disputed.  Based on the information contained in this exhibit the

Court finds that MEO made payments to Lambert Oil for the use and occupancy of the premises

5

monthly and in arrears rather than in advance.

The Trustee alleged in his Amended Complaint that the daily loan rate

amortization for the Jonesborough FMAC loan was $429.53 per day and the daily amortization

for the car wash lease payment was $86.04.  He further alleged that the daily amortization for the

Bristol store was $209.99.  The total of these three payments is $725.56 per day.  The defendants

denied these allegations.  The Trustee testified in support of these figures at trial.  The amounts

actually paid by MEO to Lambert Oil as per the above exhibit were $22,025.30 for a 30 day

month and $22,665.19 for a 31 day month.  While one would logically expect that the per diem

rates calculated from these actual payments would be identical, in fact they were not as the per

diem rate for the 30 day months was $734.18 and for the 31 day months was $731.14.  To make

matters even more confusing, the per diem rate amount which is derived by using the

information contained in Plaintiff's Exhibit no. 20 prepared by his expert witness, Mr. Timothy

Domain, was yet another figure.  That amount is derived from adding the annual debt service

determined by Mr. Domain for the two FMAC loans ($233,428) to the product of the indicated

monthly car wash payment ($1,442) times 12 months, or $17,304, for a total annual payment of

$250,732 and dividing that sum by 365 days per year, for a per diem figure of $686.94.  Because

the actual notes for the FMAC loans and the car wash lease agreement were not offered in

evidence, the Court is unable independently to determine the actual annual cost of servicing

these obligations.  Accordingly, the Court believes that the best evidence of what daily rate the

parties actually intended to agree to is evidenced by their actual conduct for the months in which

rent was paid, not to exceed the amount alleged by the Trustee to be the amount due.  Therefore,

the Court disregards the contrary calculations made by Mr. Domain and finds that the per diem

6

rate agreed to by the parties was $725.56.

The April 15, 2002 Management Contract between Lambert Oil and MEO deals with the actual conduct of the business maintained at the Jonesborough location and imposes an obligation upon MEO to pay to Lambert Oil the same amounts promised to it for such store from Quality in the Contract of Purchase and Sale.  In the Management Contract, however, the payments are not designated as "rent" for the premises but as "consideration" and MEO is entitled to retain the excess of receipts from operation of such store over such "consideration" as a "management fee".  At trial the Court inquired of the Trustee whether he had been able to determine from statements of the defendants or their counsel why such contract was between MEO and Lambert Oil, rather than between MEO and Quality, but he said that he did not know. Neither party has made any suggestion, however, that the parties actually intended the Management Contract to be between Quality and MEO or that any other error was made respecting such agreement.  The defendants did not offer any testimony or other evidence to explain the rationale for such arrangement.  In any event, such contract clearly established, at least by its terms, a direct contractual arrangement between Lambert Oil and MEO, the entity which actually was in possession of, and deriving the economic benefits from operation of, the business located at, the Jonesborough store location.  No proof was offered that any corresponding written contract was entered into with respect to the Bristol store, but the Trustee alleged upon "information and belief" that an agreement was also made for that store as well. This allegation was denied by the defendants.

Both of these contracts provided that they were to be "interpreted" by Tennessee law, although the Purchase and Sale Contract also states that it is "governed" by such law.  Both

7

contracts contain "integration" clauses to the effect that each contains the "entire agreement" of

the parties.  The Management Contract provides that it "is effective for a period of one year

beginning on April 15 [or 16, the Court is unable to determine which is intended], 2002, but shall

be subject to termination by either party upon giving ten days written notice in advance."  There

is no evidence that either contract was ever expressly terminated or declared in default by either

party.

No payments under either of these contracts were made subsequent to October 1,

2002, purportedly because Lambert Oil had stopped making the payments due to the mortgagee

and equipment lease lessor.  Nevertheless, MEO remained in possession of both stores and

continued to operate them, retaining all revenues generated as a result.  This state of affairs

continued not only until the filing of the bankruptcy case, but also thereafter until the closing of

the Trustee's sale of these two stores pursuant to this Court's approval.

Although the Contract of Purchase and Sale was quite comprehensive in its scope,

it failed to provide for the consequences of what actually occurred, which was that the closing

did not occur but the purchaser's affiliated company, MEO, remained in possession and

enjoyment of the two properties, used them to conduct business, but did not make any payments

either to the owner or the mortgagees.  It did provide, however, that in the event the transaction

failed to close due to title problems or the refusal of FMAC to approve Quality's assumption of

its financing, "Quality's earnest money would be refunded and this Contract shall thereafter be

null and void" [paragraph # 19].  If the transaction failed to close as a result of Lambert Oil's

breach of the contract, Quality was entitled either to obtain a refund of its "earnest money" and

declare the contract of no further effect, bring an action for specific performance or actual

damages, "and/or assert such other rights either at law or in equity to which it may be entitled"
[paragraph # 17].  Such contract makes no provision for refund of any "rent" paid pursuant to
paragraph no. 45.  The evidence before the Court does not reveal, at least expressly, why neither
the Contract of Purchase and Sale nor the lease provision contained in its paragraph no. 45 was
not mentioned in Schedule G or whether either party declared a default by the other party or a
termination of the agreement pursuant to its terms prior to the bankruptcy filing.

   During the chapter 11 phase of this case a new "Contract of Purchase and Sale"[5],
again drafted by Mr. Williams, was entered into on August 4, 2003 among Lambert Oil as
debtor-in-possession, MEO and Quality.  This contract specified that Quality and MEO "shall be
hereinafter collectively referred to as 'Quality'".  Under this contract, much shorter than the
prior one, the two stores and associated personalty were to be sold to "Quality" for an agreed
price of $1,509,200 to be paid in cash, subject to two agreed credits aggregating $9,200.  This
contract recognized that Lambert Oil was in bankruptcy and that competing offers for the
purchase of the properties were being solicited.  It also referenced in its "Recitations" section the
2002 Contract of Purchase and Sale "wherein Lambert also leased the Premises and the
Personalty to Quality pending closing of the sale" and further provided in numbered paragraph
23 that "Quality shall continue in possession and operate the two convenience stores located at
their respective premises until the sale hereunder is adjudicated".  However, the case was
converted to chapter 7 before approval of such contract was obtained in this Court and it never
closed.

   The evidence does indicate that after the Trustee's appointment in the case he

---

[5] Plaintiff's Exhibit no. 11.

entered into negotiations with Quality and/or MEO designed to accomplish two objectives:

resolve the bankruptcy estate's claim for rent for the two stores and effect the sale of such stores

to one or the other of such entities.  During these negotiations the Trustee and counsel for

Quality and MEO discussed proposed contractual language which would have resolved not only

the claims for use and occupancy of the stores but also their sale prices.  Unfortunately, such

negotiations were unsuccessful but MEO remained in possession and control of the stores and

continued to operate them without any payment for such benefit.  The Trustee did not make any

demand upon Quality or MEO to surrender possession of either of such stores.  He did, however,

pursue other possible purchasers for the stores and was able to reach an agreement with Rogers

Petroleum, Inc. to sell them for $1,750,000 on the condition that bidding would be open to other

possible purchasers.  This development finally provided some incentive to MEO and Quality to

change the status quo and, as a result, the Trustee and Quality entered into an Asset Purchase

Agreement[6] as of June 2, 2004 providing for the sale and purchase of the two stores and

associated personalty for a combined purchase price of $1,850,000.  The Trustee testified that at

this point the prior language which would have compromised the bankruptcy estate's claim for

rent against Quality and MEO was taken off the table.  Although the defendants at trial did not

offer any testimony from witnesses, the Trustee offered excerpts from the depositions of  Mr.

Williams, counsel for Quality and MEO, and Mr. Warren K. Broyles, which acknowledge the

correctness of the Trustee's testimony.  The Trustee's assertion also finds support in the

testimony at trial of Ms. Kay Kress, counsel for FMAC, concerning the reason for, and the

intended effect of, certain language added to section 2.2 of the Asset Purchase Agreement by a

---

[6] Plaintiff's Exhibit no. 15.

First Amendment[7] thereto entered into on or about June 8, 2004, to the effect that the general exclusion of liabilities provided for in the earlier portion of such section "shall not operate as a discharge or release of any liability incurred by the Purchaser [i.e., Quality] as a result of Purchaser's occupancy and use of the Purchased Assets."[8]  The Court finds by clear and convincing evidence that the Trustee, MEO and Quality all understood that the sale of the two stores to Quality or its designee included just the physical assets in question and not the Trustee's claims to be compensated for the use and occupancy of the subject premises prior to the closing of the sale.  This proposed sale was noticed to all parties in interest, approved by this Court, and then consummated by the Trustee's delivery of deeds to Quality and S&T for the Bristol and Jonesborough stores, respectively, on or about June 29, 2004.  The deeds made no reference to reservation of any right to the Trustee to recover compensation for pre-closing use and occupancy of such premises by Quality or MEO.

Prior to the sale of the two stores in question, the Trustee took action to obtain from the Court an extension of the time during which he was obliged either to assume or reject any unexpired leases or executory contracts to which Lambert Oil was a party, being those contracts and leases listed in Schedule G of the petition.  At no time did he represent or claim the existence of any executory contract or unexpired lease with respect to the Debtor's pre-petition agreements with Quality and MEO.

---

[7] Plaintiff's Exhibit no. 16.

[8] Further support is provided by Plaintiff's Exhibits nos. 21 and 22, which are email communications from the Trustee to Mr. Harry C. Williams, counsel for Quality, concerning the language requested by Ms. Kress amending the original language of section 2.2 of the Asset Purchase Agreement.

The Trustee filed a Complaint against MEO and Quality on November 30, 2004 seeking that MEO or Quality pay the fair market value of their possession, occupancy, and use of the Bristol and Jonesborough stores from October 1, 2002 through June 28, 2004.  The Trustee requested that the Court enter judgment for $439,689.36, with interest, plus costs and attorneys fees.  In his Amended Complaint, the Trustee requested that the Court enter judgment in an unspecified amount for the fair market value of their possession, occupancy and use of the stores from October 1, 2004 through June 28, 2004, with interest, costs and attorneys fees.  Both MEO and Quality filed an Answer and Motion to Dismiss on January 14, 2005 asserting that because the right to collect rent is a property right incident to the fee simple title in the real property, if anyone is entitled to recover, Quality, as owner, is entitled to recovery of any rents that may be due.  On August 18, 2005, the Trustee filed a Motion for Leave to Amend Complaint and to Join a Party Defendant.  On September 13, 2005, an Order was entered granting the Trustee's motion. The Trustee filed an Amended Complaint on September 27, 2005 against MEO, Quality and S&T adding an additional count seeking reformation of the Trustee's deeds to the stores to expressly exclude the estate's causes of action.  The Amended Complaint asserts that the Trustee executed and delivered a deed conveying the Bristol store to Quality and executed and delivered a deed conveying the Jonesborough store to S&T.  The Trustee alleges that each deed was executed pursuant to an Asset Purchase Agreement, as amended, and pursuant to the Order entered by the Court on June 10, 2004 approving the sale of the property.  The Trustee further alleges that the first amendment was executed after extensive discussions by which the parties agreed that the estate's cause of action to recover the fair market value of Quality's and MEO's possession and use of the stores would be excluded from assets purchased by Quality.  To the

12

extent that the Court determines that the Trustee's deeds conveyed the estate's causes of action to them, the Trustee asserts that such conveyance was contrary to the intentions of the parties and a mistake of fact. The Trustee requests the Court to reform each of the deeds to include a provision that evidences the parties' intent and that expressly excludes the estate's causes of action to recover the fair market value of Quality's and MEO's possession and use of the stores. On October 24, 2005, all three defendants filed an Answer and Motion to Dismiss the amended complaint asserting that the additional allegations regarding reformation involved either an interpretation of documents or a description of the legal significance or import of documents that is a question of law and required no admission or denial.

This Court's Memorandum Decision entered May 8, 2006 denied the defendants' Motion for Summary Judgment and their request that the Court stay the proceeding and require the Trustee to seek a determination as to whether FMAC had a valid security interest in the Trustee's rent claims advanced in this proceeding, but granted the defendants leave to file a third party complaint against FMAC if the latter failed to file a pleading consenting to be bound by the result obtained by the Trustee in this proceeding concerning such claims. Thereafter, Capmark Finance, Inc., f/k/a GMAC Commercial Mortgage Corporation, Servicer for FMAC Loan Receivables Trust 2000-A, filed such a consent on May 17, 2006 as docket entry no. 52. This consent was apparently satisfactory to the defendants as they made no move either then or later to file any third party complaint against FMAC or its applicable successor-in-interest.

The Trustee did not offer at trial any evidence concerning the fair market rental value of the Bristol and Jonesborough stores during the period of time in question other than the "rent" or "consideration" provided for in the 2002 Contract of Purchase and Sale and the April

13

15, 2002 Management Agreement.  He did offer the testimony of Mr. Timothy Domain, an

accountant and convenience store business consultant, that the amount due for rent for the store

locations pursuant to the terms of the 2002 Contract of Purchase and Sale for the period of

twenty-one months from October 1, 2002 thru June, 2004 was $438,774.


## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28

U.S.C. §§ 1334(a) and (b) and 157(a) and the delegation made to this Court by Order from the

District Court on July 24, 1984.   The Trustee has alleged that this adversary proceeding is a

"core" bankruptcy proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O) and the defendants

have all admitted such contention.  Federal Rules of Bankruptcy Procedure 7008(a) and 7012(b)

require that the parties allege or admit or deny, as may be applicable, whether the proceeding is

"core" or "non-core" and if the proceeding is non-core, whether such party does or does not

consent to entry of final orders by the bankruptcy judge.  The Court concludes that the language

of these Rules and the provisions of 28 U.S.C. § 157 contemplate that the Court need not make

an independent and contrary determination that a proceeding is non-core when the parties in

interest have effectively stipulated the dispute to be a "core" proceeding, at least where the Court

clearly has jurisdiction.  It is quite clear that by virtue of the delegation from the District Court

this bankruptcy court has jurisdiction of this adversary proceeding as being one "related to" a

case under title 11 because its resolution affects the bankruptcy estate.  *See generally,* 28 U.S.C.

§ 1334(b)*; Federal Rules of Bankruptcy Procedure 7008(a) and 7012(b); *In re Apex. Exp. Corp.*,

190 F.3d 624, 631-32 (4th Cir. 1999); *Beard v. Braunstein*, 914 F.2d 434, 443-44 (3rd Cir.

14

1990); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984).  Accordingly, the Court will treat

this adversary proceeding as a "core" proceeding and will enter judgment in it.

COUNT 1

As to Count 1 of the Amended Complaint, the defendants argue that (1) there

was no express or implied agreement entitling the Trustee to be paid rent for that period; (2) any

such agreement would be contrary to the provisions of the Court's Order granting the motion to

sell; and (3) when the Trustee sold the stores free and clear of all liens, claims, rights and

interests, he conveyed the rights and interests he seeks to assert in this adversary proceeding.

The defendants argue that there was no express agreement that the Trustee reserved the right to

be paid the rent for the period prior to the actual sale of the stores, nor did the Court's Order

granting the Trustee's Motion for Authority to Sell Free and Clear of Liens entered on June 10,

2004 make provision for the reservation of such right.

The essence of the defendants' arguments challenging Count I of the Amended

Complaint can be summarized as follows:  None of the defendants ever reached an agreement

with either Lambert Oil as debtor-in-possession or the Trustee upon the term of any lease or the

amount of rent to be paid; if no agreement is made otherwise as to when rent is payable for use

and occupancy of property, it is payable at the end of the term; because the term of occupancy

did not end prior to the Trustee's sale of the property, no rent due had "accrued" prior to the sale;

unless otherwise expressly agreed, the right to collect accrued rents remains with the seller of

property but the right to collect non-accrued rents passes to the purchaser; therefore no rent

having been agreed upon, no obligation to pay rent had accrued and any right to collect the same,

in the absence of any express reservation, passed to the buyer of the properties.  Both sides seem

15

to agree that the right to collect "accrued" rents remained with the Trustee unless expressly assigned, which clearly did not occur here, and therefore the defendants' entire supposition can stand only if no claim for the value of the use and occupancy of the properties had "accrued" prior to the Trustee's sale of the two stores. Counsel for the defendants conceded at the hearing upon his clients' Motion for Summary Judgment that he had been unable to find any case clearly and specifically upholding his position, but that nevertheless it constituted a correct application of the governing legal principles to the facts of this case.

The defendants' brief in support of their Motion for Summary Judgment asserts, "Accrued rent means and signifies rent that is due and payable. *Estate of Caldwell v. Woods,* 1989 WL 11738 (Tenn. App., Feb. 15, 1989); *Prudential Ins. Co. of America v. Buss*, 37 NW 2d 300 (Iowa, 1949)." Defs' Brief 17. Furthermore, counsel cites 49 *Am Jur 2d, Landlord and Tenant* § 713 in support of the statement, "Where lease has no time of payment, the rent does not become due and payable until the end of the term." *Id.* at 16. Recourse to that treatise indicates, however, that the actual statement it contains is much more specific in nature than the generalized version counsel has proffered. The actual language of the relevant sentence reads as follows:

> Where a term of years is granted for a gross rent without specification as to the time of payment, the common-law rule is that the rent does not become due and payable until the end of the term, and that where by the contract the rent is payable either yearly, half-yearly, quarterly, monthly, or weekly, and there is no provision for payment at any particular time during such periods, either expressly made or to be gathered by necessary implication from the acts and circumstances of the parties or by custom or usage in the community, the rent is not due and payable until the end of those respective periods.

49 *Am Jur 2d* 584, *Landlord and Tenant* § 713 (1995) (footnotes omitted). It is readily apparent

that this rule applies to an express lease agreement for a specific lease term, such as a lease for one year, with no payment date for the rent being provided for.  In such an arrangement it is clear that no rent is due until the end of the year and therefore none has "accrued" until that time has arrived.  Accordingly, if the property is sold during that year and no express agreement otherwise is made, the owner of the property at the time the rent does become due is the party entitled to collect it.  That, however, is not the situation presented in this proceeding.  The problem here was not just that the parties couldn't agree upon or didn't provide for when rent would be due under a lease agreement following any failure of the contract of purchase and sale, they were unable to agree upon any specific term of lease or rent payable subsequent to such a failure, much less when any such rent would be due and payable.  While the general rule is that a vendee who enters upon property pursuant to a contract of purchase does not create a landlord and tenant relationship with the seller, 77 *Am Jur 2d* 345*, Vendor and Purchaser* § 319 (1997), and therefore is not liable for rent for use and occupation of the premises, *Id.* at 346, § 321, that rule relates to an asserted <u>implied</u> promise to pay rent in an <u>express</u> contract of sale.  In the case before the Court it is significant that the contract of sale expressly provided that the purchaser would pay "daily rent" in specified amounts until closing after it "[took] over" the possession and control of the two convenience stores.  While it is certainly true that such payments were to be credited against the $195,000 balance of the purchase price due at closing, the parties expressly agreed that such payments would be denominated as "rent".  They easily could have done otherwise by simply providing that the purchaser would advance to Lambert Oil each month the current payments due upon the two mortgages and equipment lease until closing and receive a credit at closing for such interim payments or a refund if the transaction failed to close.

17

It indeed is significant, as counsel for the Trustee has pointed out, that the Contract of Purchase

and Sale provided for a refund of the "earnest money" deposit in the event the transaction failed

to close, but not for a refund of any rent paid pursuant to the contract before such time as well.

The Court will certainly not assume that a contract drafted by Quality's own counsel used the

term "rent", a very common one in both everyday speech and legal terminology, without a good

understanding by the involved parties of the legal significance of that term.  The defendants have

failed to offer any testimony or other evidence to illuminate the intentions of the parties

regarding the use of the term "rent" in the Contract, although they certainly have offered

extended argument that the provision of the contract providing a credit against the purchase price

of the properties for the "rent" paid means that the Court should rule that such payments in fact

were not actual "rent" for the value of the use and occupancy of the store properties.  Under the

circumstances presented here where Quality or its affiliate, MEO, entered into possession of the

premises subject to an express obligation to pay "daily rent" and in fact did pay such rent

monthly for five months or more, which was for a period extending beyond the closing date

provided for in the Contract of Purchase and Sale, this Court concluded in its Memorandum

Decision denying the defendants' Motion for Summary Judgment that the proper rule to apply

for that period of time following the termination or effective abandonment of the contract by the

parties was the same one applicable to a tenant who enters into possession and pays rent under

an invalid lease, which thereby creates a periodic tenancy with the period of tenancy being

determined by the interval between rental payments.  *See Kent v. Humphries*, 303 N.C. 675, 281

S.E.2d 43, 46 (1981);  *Annot.*, Character and Duration of Tenancy Created by Entry Under

Invalid or Unenforceable Lease, 6 A.L.R.2d 685, §§ 7 - 17 (1949); 49 *Am Jur 2d* 130-31,

*Landlord and Tenant* § 113 (1995); Restatement (Second) of Property, Landlord and Tenant §

2.3(d) (1977).

      Both the sale contract and the Management Contract provided for "daily" rent or

"consideration" but did not specify at what intervals such rent compensation was to be paid.

Certainly the liability for rent "accrued" daily.  On the other hand, the actual practice observed

by, and apparently mutually satisfactory to, the parties was to pay such rent monthly in arrears.

At the very least an obligation to pay rent in some amount for every month preceding the month

in which the closing of the Trustee's sale occurred "accrued" prior to the conveyances of the two

stores by the Trustee.  If the "accrual" of rent for the purpose of allotment between the vendor

and purchaser is determined by the date on which such rent by the custom of the parties was

payable, the rent for the period June 1 - June 28, 2004 had not accrued before the Trustee's

conveyance of the stores to Quality and S&T.  If such "accrual" is determined by the actual

wording of the agreement which provided for "daily rent", all rent thru June 28, 2004 had

"accrued" prior to closing of the sale transaction on or about June 29, 2004.  *See* 49 *Am Jur 2d*

580*, Landlord and Tenant* § 708 (1995).  After further consideration the Court concludes that the

original express agreement of the parties for payment of daily rent should be given precedence

over the frequency of payment of such rent because the incurring of liability to pay daily rent is

not inconsistent with the payment of such rent monthly, which obviously would have been much

more convenient to them both than a daily payment of rent, especially considering that Lambert

Oil's financial obligations for the two stores were payable monthly.  The timing of the actual

payments does not change the fact that the tenant/management agent/occupant's liability for the

use and occupancy of the premises accrued on a daily basis.  Such an arrangement was in

19

harmony with the nature of the contemplated transaction because the term of Quality's tenancy

was not expected to last beyond the closing of the sale transaction, an event which the parties

then expected to occur within ninety days.  Therefore, the Court concludes that only the right to

receive future accruing rents passed to the grantees of the deeds.  *See* 49 *Am Jur 2d* at 558, 571,

577, 580, and 600*, Landlord and Tenant* §§ 677, 693, 705, 708, and 731 (1995).  To rule

otherwise would make an agreement to pay "daily rent" the effective equivalent of an agreement

to pay "monthly rent".

   The defendants argue forcefully and repeatedly that the daily rent provision

contained in the 2002 Contract of Purchase and Sale did not constitute a lease agreement and the

economic reality was that the dollar-for-dollar credit provided to Quality in such Contract for

debt service payments against the balance of the $195,000 balance of the cash portion of the

purchase price to be paid at closing was simply a scheme to maintain such debt service in a

current status until the contemplated closing could occur.  If this argument is accepted, then the

provision of such Contract concerning daily rent is not evidence of the actual then fair rental

value of the convenience stores, and the plaintiff failed to introduce any other evidence of such

rental value.  Therefore, it is contended, the plaintiff's case must fail for want of proof.  It

certainly is true that the rent provisions of such Contract must be considered in light of the

principal purpose of such Contract, which was to effect the sale and purchase of the Bristol and

Jonesborough stores.  The Court believes it is appropriate to note what it believes to be common

knowledge that it is not usual or customary for the buyer or the buyer's affiliate to enter into

actual possession of, and operation of a business located upon, property which is the subject of a

sale contract.  Nevertheless, on occasion, as was the case here, such an arrangement is in the

20

mutual interests of the parties involved.  It is apparent that it was in the interests of both the

seller and the buyer to continue operation of the convenience store businesses located at the two

locations in question pending an actual transfer of legal ownership.  Accordingly, the fair rental

value of the two stores as operating businesses was very likely significantly higher that would

have been the case for the value of such properties simply as vacant physical assets.  The fact

that MEO as the actual operating business entity was willing to enter into a Management

Contract for the term of a year in which it agreed to pay the daily cost of the debt service on the

two properties in question in exchange for the right to operate the convenience store businesses

located there and keep whatever excess cash flow resulting therefrom it might be able to

generate, is likely as good evidence as a court is likely to get that, at least in the case of these two

stores, the pro rata daily cost of the debt service upon these stores was equivalent to the fair

rental value of such properties as operating convenience store businesses.  While it may have be

unusual for a buyer or its affiliate to enter into possession of real property prior to closing of the

sale contract, when such circumstance is expressly contemplated and provided for by the

contracting parties, it certainly makes sense that they would provide for compensation in some

form to the seller for giving up possession and the economic benefits of the property prior to

receiving the agreed purchase price.  They expressly did so here.  While the Contract they agreed

to expressly recognized the possibility that the sale contract provisions might fail for a variety of

reasons, whether due to the default of the seller or the buyer or for some other reason altogether,

they did not provide that any rent payments made in the interim would be refunded to the buyer.

While the full credit provision of the sale contract for interim rent payments was undoubtedly

unusual, the Court observes that the concept of "rent-to-own" is not only a known concept, but

21

also a business model for some apparently successful businesses existing in the general economy.

The Court further concludes that MEO is obligated under the terms of the Contract of Purchase and Sale to pay rent to Lambert Oil's Trustee in Bankruptcy for its occupancy and use of the two convenience stores both before and after the petition filing date. That conclusion is based on the combination of the following factors:  MEO and Quality were commonly owned and controlled, MEO was expressly mentioned in the Contract of Purchase and Sale and paid the $5,000 earnest money deposit to Lambert Oil, it entered into actual occupancy and use of the stores with the express consent of Lambert Oil as to the Jonesborough store and clearly with at least the implicit approval of both Quality and Lambert Oil as to both stores, it entered into the Management Contract providing for precisely the same amount of financial obligation for the operation of the Jonesborough convenience store as was imposed upon Quality in the Contract of Purchase and Sale, it paid substantial rent to Lambert Oil over the period April 16, 2002 thru September 30, 2002 with respect to both stores in satisfaction of Quality's obligations under the sale contract, and it continued to occupy and operate such stores from the date or dates it began doing so all the way until the date such stores were conveyed to Quality and S&T.

The more challenging question before the Court is whether the Trustee's right to be compensated for the use and occupancy of the Debtor's stores is only enforceable against MEO, the legal entity in actual possession of such premises and conducting business thereon, or jointly and severally against both MEO and Quality, the latter being the party which under the Contract of Purchase and Sale had expressly agreed to pay "daily rent" to Lambert Oil.  The

analysis of the legal relationship among these three parties is difficult as it seems to the Court

that the Management Contract should have been between Quality and MEO, as the former was

the legal entity both entitled to possession of the two stores and obligated to pay rent for such

possession under the terms of the sale contract, rather than between Lambert Oil and MEO.  In

short, the provisions of such contracts appear inconsistent rather than complementary.  Be that as

it may, however, apparently for reasons not known to the Court, such contract was made

between Lambert Oil and MEO.  While only a Management Contract for the Jonesborough store

was located and introduced into evidence, that strikes the Court as of much lesser significance

than the fact that MEO actually paid rent directly to Lambert Oil, which the latter accepted, and

clearly all three parties expected and intended that MEO would be the entity actually operating

the convenience store businesses located at both locations.  There is authority to the effect that

the landlord can hold the original tenant liable for rent or damages as a result of the holdover by

a sub-tenant, even when such holdover is contrary to the original tenant's wishes and even when

it breaches the sub-tenant's obligations to such original tenant.  *See Sanchez v. Eleven Fourteen,*

*Inc.,* 623 A.2d 1179, 1181 (D.C. 1993).  There is also authority, however, that when the holding

over is with the landlord's consent, a direct contractual relationship is established between the

landlord and sub-tenant which excuses the original tenant from financial responsibility for rent

beyond the agreed term of the lease.  *See Comedy v. Vito,* 492 A.2d 276, 279 (D.C. 1985); 49 *Am*

*Jur 2d* 883, *Landlord and Tenant* § 1126 (1995).  The Court concludes that the latter rule is the

one more appropriate to the facts presented here.  Clearly MEO's continued occupancy of the

two stores after it was apparent that the Contract of Purchase and Sale had failed of its essential

purpose was with the explicit (as to the Jonesborough store) or implicit (as to the Bristol store)

consent of Lambert Oil, both before the bankruptcy filing and afterwards when Lambert Oil

acted as debtor-in-possession during the chapter 11 phase of this case, and with the effective

consent of the Trustee after his entry into the case.  At least after the expiration of the

Management Contract, Lambert Oil or the Trustee afterwards as its successor-in-interest could

have demanded that MEO vacate both store premises; neither ever did so.  Similarly, MEO was

free to terminate the existing arrangement at any time; it never did.  After all, neither Quality nor

MEO ever agreed to pay "rent" or other "consideration" on anything other than a daily basis.  It

would be difficult to imagine facts which might more clearly evidence that MEO's "holding

over" was not wrongful as to the landlord, but rather was approved of by it, than are presented in

this proceeding.  Under such facts the Court concludes that however the legal relationship

between Quality and MEO or between Lambert Oil and MEO, with respect to the properties

which are the subject of this proceeding, might be characterized most accurately, there is no

legitimate basis to award the Trustee a judgment against Quality, a legal entity not in actual

possession of the premises, but at the very most only constructive possession of same, when

MEO's actual possession of, and operation of the businesses located on, such premises was with

Lambert Oil's and the Trustee's tacit, if not indeed express, approval and consent.


### STORES SOLD "FREE AND CLEAR" OF CLAIMS

Next, the Court will evaluate the defendants' suggestion that to permit the Trustee

to make a claim against any of them for pre-purchase rents is at odds with this Court's action

approving the sale of the stores "free and clear" of any liens, claims or interests.  Such language

has nothing to do with liability for use and occupation of these stores by any of the purchasers

prior to the sale, which liability they would have continued to have had if the Trustee had sold

the stores to Rogers Petroleum, and when Quality and MEO decided to enter upon the playing

field of competitors for the purchase of such stores, they did it on the same basis as any other

possible purchaser and not with any advantage of being able both to purchase the stores and also

eliminate the Trustee's claims for pre-sale rents in one fell swoop.  In short, the language of this

Court's Order pursuant to the Trustee's Motion provided the same protection to Quality and

MEO as any purchaser of the stores from liabilities associated with acquisition of ownership of

the properties, but did not release them from liability for their own pre-sale enjoyment of the

economic benefits flowing from their operation of the convenience store businesses at the

subject locations.

FAILURE OF TRUSTEE TO ASSUME LEASES OR EXECUTORY
CONTRACTS APPLICABLE TO SOLD PROPERTIES

The defendants also argue that they can have no liability for "rent" or

"consideration" arising out of the contracts signed by Quality and MEO because such contracts

were never assumed by the debtor-in-possession or the Trustee during the bankruptcy case and

therefore, by operation of section 365 of the Bankruptcy Code, such contracts were rejected and

rendered of no further effect.  Therefore, because there is no allegation or proof of any other

agreement between any of them and Lambert Oil or the Trustee providing for a lease of the two

stores and no proof of the fair rental value of such stores during the pertinent period of time in

question, there is no basis for this court to enter judgment against any of them for the occupancy

of such properties from October 1, 2002 until June 29, 2004.

The Court concludes that this contention is without merit for three reasons.  First,

25

the legal effect in bankruptcy of a "rejection" of a lease or other executory contract is not the

same as a cancellation or complete termination of the lease or contract, but rather a breach by the

bankruptcy debtor of the applicable contractual relationship entitling the counter-party to a

potential claim against the bankruptcy estate for the resulting injury to such counter-party.  *See*

*generally* 11 U.S.C. § 365(g) and (h)*; In re Modern Textile, Inc.,* 900 F.2d 1184 (8th Cir. 1990);

*In re Continental Airlines Corp.,* 981 F.2d 1450 (5th Cir. 1993); *In re CP Holdings*, 349 B.R.

189, 192 (8th Cir. BAP 2006).  Accordingly, the bankruptcy "rejection" of the Contract of

Purchase and Sale and the Management Contract did not deprive such agreements of all

continuing legal effect or consequence in the bankruptcy case.

Second, the use of such contracts to establish a rental rate is not equivalent to an

acceptance of the benefits of such contract accompanied by a refusal to accept their burdens.

Their use is for the sole purpose of establishing the fair rental value of premises of which MEO

remained in full possession and enjoyment after its contractual rights to do so expired, in the

absence of other evidence from the parties establishing any rental value during the period of

holding over different than what they agreed to originally.  Either party at trial was free to offer

other evidence asserting a different rental value for any part or all of the holding over period than

what had been agreed to originally, but neither did.  When one enters upon the property of

another pursuant to an express agreement to pay rent, however it may be denominated in their

contractual arrangements, for some agreed period of time, but fails to vacate such property at the

conclusion of such time and fails to reach any understanding with the property's owner as to any

different rate of rent thereafter, the law does not permit him to escape financial responsibility to

continue to pay at the originally agreed upon rate on the theory that he had not agreed upon any

26

rate for any period of holding over and the owner had failed to evict him from the premises.  The

fact that the two written contracts had either expired or failed according to their terms long

before bankruptcy transpired cannot alter the facts that the parties had agreed and acted upon a

specific rate of compensation for the use, occupancy and enjoyment of the Bristol and

Jonesborough stores during a period of time and MEO remained in actual possession of such

properties thereafter without any express agreement as to the terms and conditions therefore and

without any compulsion to do so other than its own financial self-interest.

   Third, the rejection in bankruptcy of a lease applies to any "unexpired" lease.  In

the situation before this Court, the contractual lease itself had expired, although the leasehold

estate continued to exist as long as MEO continued to remain in possession of Lambert Oil's

premises.  *Id.*  MEO remained in actual possession of Lambert Oil's properties subject to a

responsibility to pay daily rent for each day of such occupancy.  It appears to have had the legal

status of "tenant at will" as either party was free to terminate the tenancy at pleasure.  *See*

*Warehouse Distributors, Inc. v. Prudential Storage & Van Corp.*, 208 Va. 784, 788, 161 S.E.2d

86, 89 (1968); 49 *Am Jur 2d* 147, *Landlord and Tenant* § 133 (1995).


## PRE-JUDGMENT INTEREST

   The governing provision on the issue of pre-judgment interest is Va. Code §8.01-

382 (2005), which provides "[i]n any action at law or suit in equity . . . the judgment or decree of

the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the

period at which the interest shall commence."  Whether pre-judgment interest should be awarded

under this statute is a matter within the sound discretion of the court.  *See Hitachi Credit*

*America Corp. v. Signet Bank,* 166 F.3d 614, 633 (4th Cir. 1999).

The purpose of pre-judgment interest is "to compensate the plaintiff who has been without relief for an extended period of time." *Gill v. Rollins Protective Services Co.,* 836 F.2d 194, 198 (4th Cir. 1987). The defendants of course dispute that they are liable to the Trustee for any amount, much less any pre-judgment interest on a disputed claim. The Trustee has offered evidence that when MEO stopped making payments to Lambert Oil in the Fall of 2002, the former represented that future rent payments would be placed in an escrow account until the matters between the parties were resolved. The defendants have not offered any evidence to dispute this evidence. There is no indication that any such payments into an escrow account were actually made. By reason of not making such payments MEO has enjoyed the use of funds represented thereby, a considerable benefit considering that we're dealing with a rental obligation of approximately $22,000 a month. It is fair and equitable both to MEO and the bankruptcy estate that MEO pay pre-judgment interest upon each rent payment not made from the first day of the month immediately following the month in which such rent accrued until the date of this judgment. To rule otherwise would reward MEO for not paying readily determinable amounts for which it was responsible to Lambert Oil or its bankruptcy estate when due or placing such amounts in an escrow account which might earn interest until all matters in controversy could be resolved. *See Marks v. Sanzo,* 231 Va. 350, 356, 345 S.E.2d 263, 267 (1986) (stating prejudgment interest is "necessary to place the [plaintiff] in the position he would have occupied if the party in default had fulfilled his obligations").

With regard to the correct prejudgment interest rate, the Virginia Code currently

provides in relevant part that

> The judgment rate of interest shall be an annual rate of six percent . . . . If the contract or other instrument does not fix an interest rate, the court shall apply the judgment rate of six percent to calculate prejudgment interest pursuant to §8.01-382 and to calculate post-judgment interest.

Va. Code §6.1-330.54 (2004) (amended 2005).  The Trustee has requested prejudgment interest be awarded at nine percent, which was the rate of prejudgment interest provided in Va. Code §6.1-330.54 prior to the 2004 amendment[9], for those payments due to be paid prior to July 1, 2004 from their respective due dates until the statutory amendment's effective date, and at 6% thereafter until the date of judgment.  Absent the contrary ruling of the District Court in the adversary proceeding *Lambert v. Callahan (In re Lambert Oil Co., Inc.),* 347 B.R. 508 (W.D. Va. 2006), that is likely what this Court would do.  Such ruling, however, unless and until it might be reversed or overruled, is controlling in this Court.  Accordingly, the Court will award pre-judgment simple interest at the rate of 6% per annum from the due date of each payment due from MEO as determined in this Decision until November 24, 2006, the date hereof.  The Court's calculation of the rent payments due and unpaid and pre-judgment interest thereon is as follows:

| Month Accrued (# days in month) | Date Payment Due | Amount of Payment | # Days to 11/24/2006 | Interest Due |
|---|---|---|---|---|

---

[9] Pursuant to Va. Code §6.1-330.54, the judgment rate of interest was nine percent from 1991 to June 30, 2004.  On July 1, 2004, the judgment rate of interest was reduced to six percent. *See* Va. Code Ann. §6.1-330.54 (Supp. 2005).

| | | | | |
|---|---|---|---|---|
| October 2002      (31) | November 1, 2002 | $22,492.36 | 1,485 | $5,490.04 |
| November 2002  (30) | December 1, 2002 | $21,766.80 | 1,455 | $5,205.99 |
| December 2002  (31) | January 1, 2003 | $22,492.36 | 1,424 | $5,264.53 |
| January 2003      (31) | February 1, 2003 | $22,492.36 | 1,393 | $5,149.92 |
| February 2003    (28) | March 1, 2003 | $20,315.68 | 1,365 | $4,557.73 |
| March 2003        (31) | April 1, 2003 | $22,492.36 | 1,334 | $4,931.80 |
| April 2003          (30) | May 1, 2003 | $21,766.80 | 1,304 | $4,665.71 |
| May 2003            (31) | June 1, 2003 | $22,492.36 | 1,273 | $4,706.28 |
| June 2003           (30) | July 1, 2003 | $21,766.80 | 1,243 | $4,447.45 |
| July 2003            (31) | August 1, 2003 | $22,492.36 | 1,212 | $4,480.76 |
| August 2003        (31) | September 1, 2003 | $22,492.36 | 1,181 | $4,366.16 |
| September 2003  (30) | October 1, 2003 | $21,766.80 | 1,151 | $4,118.28 |
| October 2003      (31) | November 1, 2003 | $22,492.36 | 1,120 | $4,140.64 |
| November 2003  (30) | December 1, 2003 | $21,766.80 | 1,090 | $3,900.02 |
| December 2003 (31) | January 1, 2004 | $22,492.36 | 1,059 | $3,915.12 |
| January 2004      (31) | February 1, 2004 | $22,492.36 | 1,028 | $3,800.52 |
| February 2004 (29) | March 1, 2004 | $21,041.24 | 999 | $3,454.54 |
| March 2004        (31) | April 1, 2004 | $22,492.36 | 968 | $3,578.70 |
| April 2004          (30) | May 1, 2004 | $21,766.80 | 938 | $3,356.16 |
| May 2004            (31) | June 1, 2004 | $22,492.36 | 907 | $3,353.18 |
| June 2004           (28) | July 1, 2004 | $20,315.68 | 877 | $2,928.30 |
| **TOTAL** | | **$462,181.72** | | **$89,811.83** |

COUNT 2

Count 2 of the Amended Complaint might be described as a protective or safeguard count seeking reformation of the deeds to reserve in express terms to the Trustee any claims for compensation for pre-closing use and occupancy of the premises.  Count 2 is only material if the Court were to accept the defendants' contention that the deeds of conveyance to Quality and S&T by operation of law conveyed the Trustee's claims for pre-closing use and occupancy of the store premises by MEO along with fee simple title to the properties.  It is premised on an alleged mutual mistake of fact.[10]  The Court has upheld, however, the Trustee's contention in Count 1 that such claims were not conveyed by such deeds.  Accordingly, there was no mistake and the terms of the deeds were consistent with the understandings of the parties at the time that the grantees were not acquiring the pre-closing rent claims.  If this determination is correct, there is no reason to reform the deeds and Count 2 is moot.

CONCLUSION

For the reasons noted above, the Court by a separate order will enter judgment in favor of the Trustee against MEO in the amount of $551,993.55, composed of pre-closing rent in the amount of $462,181.72 and pre-judgment interest in the amount of $89,811.83, plus interest thereon at the federal judgment rate of interest in effect on this date until the time of payment, and his taxable costs incurred in this proceeding or in the collection of such judgment.

---

[10] If any mistake had been made, it would appear to be one of law rather than fact.  *See Clarksburg Trust Co. v. Commercial Casualty Ins. Co.*, 40 F.2d 626, 629-31, *cert. denied*, 289 U.S. 731 (1933); *United Virginia Bank v. Cleveland (In re Cleveland)*, 53 B.R. 814, 820 (Bankr. E.D. Va. 1985).

31

The Court will also grant the Motions to Dismiss filed by Quality and S&T with each party to bear its own taxable costs.

This 24th day of November, 2006.

_William F. Stone, Jr._
UNITED STATES BANKRUPTCY JUDGE

32